***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Rideout and the briefs and arguments before the Full Commission. The appealing party has shown good grounds to reconsider the evidence, and upon reconsideration, the Full Commission affirms in part and reverses in part the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as: *Page 2 
 STIPULATIONS
1. All parties are properly before the North Carolina Industrial Commission; the Commission has jurisdiction of the parties and of the subject matter of this action; and the parties are bound by the provisions of the Workers' Compensation Act.
2. All parties have been correctly designated.
3. Key Risk Insurance Company is the carrier on the risk.
4. On May 31, 2006, the date of the subject injury, the relationship of employee
and employer existed between plaintiff and defendant-employer.
5. Plaintiff sustained an admittedly compensable injury to his right hip arising out of and in the course of his employment with defendant-employer on May 31, 2006.
6. Defendants admitted the compensability of plaintiff's right hip injury pursuant to a Form 60 dated August 28, 2006.
7. There is a dispute between the parties as to the compensability of plaintiff's alleged back injury. Plaintiff alleges and defendants deny that plaintiff also injured his back as a direct result of the admittedly compensable accident of May 31, 2006, or as a consequence of the admittedly compensable injury by accident of May 31, 2006. Defendants denied the compensability of plaintiff's back injury pursuant to a Form 61 dated January 17, 2007.
8. As a result of plaintiff's admittedly compensable injury by accident of May 31, 2006, defendant-carrier initiated payment of temporary total disability benefits to plaintiff effective August 22, 2006, at a weekly compensation rate of $612.53 and has continued to make such payments to the present.
9. Plaintiff's average weekly wage is $966.90, which yields a compensation rate of $644.63. The average weekly wage and resulting compensation rate are greater than that shown *Page 3 
on the Form 22 because certain amounts of plaintiff's gross earnings during the 52 week period were not included on the Form 22. The parties stipulated and agreed that there has been an underpayment of compensation and defendant-carrier agreed to promptly issue an arrearage check, subject to an attorney's fee for plaintiff's counsel as approved by the Commission.
10. All Industrial Commission forms, pleadings, Orders and Awards filed in this matter are part of the evidence of record.
11. The issues before the Commission are whether plaintiff injured or significantly aggravated or accelerated a pre-existing condition in his back as a result of his injury by accident of May 31, 2006; whether plaintiff is entitled to payment of the medical treatment incurred as a result of his back injury; and whether plaintiff is entitled to an award of costs, including reasonable attorney's fees, pursuant to N.C. Gen. Stat. § 97-88.1.
 ***********
Based upon the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. On the date of the hearing before the Deputy Commissioner, plaintiff was 58 years old and a resident of Kernersville, North Carolina. He graduated from high school in 1967 and has no further formal education. Plaintiff served in the United States Air Force and was honorably discharged in 1972.
2. Plaintiff was employed by defendant-employer as a forklift service mechanic from 1990 until shortly after his injury.
3. Plaintiff's average weekly wage was $966.90, resulting in the compensation rate of $644.63. Plaintiff's hourly rate of pay was $23.50 per hour. *Page 4 
4. Plaintiff had a pre-existing lower back condition that required intermittent medical treatment since about September 14, 1994, when he sustained a lower back strain while lifting in the performance of his job duties for defendant-employer. At that time, plaintiff underwent a course of conservative medical treatment under the direction the physicians at Johnson Neurological, including physical therapy for about five weeks. A CT scan was positive for a bulging disc at the L4-L5 level of his spine, which contributed to his left-sided pain. Plaintiff was released to return to his regular job duties and resumed his regular job duties on October 17, 1994. No permanency rating was assigned.
5. In July 1999, plaintiff aggravated his lower back condition while moving furniture at home. He was treated at Urgent Medical and Family Care. An August 16, 1999 MRI revealed multi-level degenerative disc disease and non-compressive bulges at L4-L5 and L5-S1, without evidence of compressive stenosis or lateralizing herniated discs. After a course of physical therapy, plaintiff returned to his regular work on September 9, 1999.
6. In August 2000, plaintiff again aggravated his lower back after lifting a heavy object at home. Plaintiff did not miss any time from work.
7. In August, 2003, plaintiff again sought treatment for complaints of lower back pain and received a cortisone injection from Dr. Stanley Schaeffer of Walkertown Family Practice.
8. On June 14, 2004, plaintiff again injured his lower back at work and saw his family physician, Dr. Schaeffer. Plaintiff reported complaints of pain in his lower back, as well as right hip pain that radiated down his right leg. Dr. Schaeffer diagnosed sciatica and gave plaintiff a cortisone injection. Dr. Schaeffer took plaintiff out of work for approximately one week, from June 15 to June 22, 2004. Plaintiff was able to return to his regular job duties. *Page 5 
9. On July 30, 2004, plaintiff exacerbated his low back condition after hitting a deer with his motor vehicle and then removing the deer from the highway. He did not miss time from work. Plaintiff also complained of an increase in his low back pain on October 8, 2004, after performing heavy lifting at work. Plaintiff sought treatment from Dr. Schaeffer, who prescribed Naprosyn and Lortab for pain. Plaintiff returned to Dr. Schaeffer on October 13, 2004 regarding his back pain. Dr. Schaeffer prescribed continued use of pain medications, obtained two x-rays and ordered an MRI of plaintiff's lower back. The x-rays showed some mild disc space narrowing at L4-L5 and small bone spurs on the right at the SI joint. The MRI on October 21, 2004 showed degenerative disc disease at L4-L5 and a small central disc protrusion at L5-S1 without nerve impingement. Dr. Schaeffer stated that the MRI study was consistent with his diagnosis of chronic back pain and that surgery was not recommended. The only treatment prescribed was medications. Plaintiff returned to his regular job after missing approximately one week from work.
10. Plaintiff continued to perform his regular job duties as a forklift service mechanic without physical difficulties. Plaintiff had a follow-up appointment with Dr. Schaeffer for lower back pain on April 1, 2005. Prior to the injury giving rise to this claim, plaintiff was last evaluated by Dr. Schaeffer for any complaints related to his lower back on January 20, 2006. Dr. Schaeffer continued plaintiff's prescription for the pain medication Lortab twice a day. Dr. Schaeffer did not take plaintiff out of work in 2005 or in 2006 for problems related to his back. Dr. Schaffer did not assign any work restrictions for plaintiff relative to his lower back following his January 20, 2006 appointment.
11. Plaintiff had no medical treatment for problems related to his lower back between January 20, 2006 and May 31, 2006, the date of this injury by accident. Plaintiff was able to *Page 6 
perform his regular job duties as a forklift service mechanic without physical difficulties until the time of his fall at work on May 31, 2006. Plaintiff did not have any problems walking before his injury of May 31, 2006 and did not walk with a limp.
12. Plaintiff's job as a forklift service mechanic is classified in the very heavy physical demand category. The job required the ability to lift 150-200 pounds and involved a lot of standing and climbing. Plaintiff was able to perform the physical demands of his job duties until his injury by accident on May 31, 2006.
13. On May 31, 2006, plaintiff sustained an admittedly compensable injury by accident while he was working. Plaintiff was on a 4,000 pound capacity forklift performing a repair when his left foot slipped and he began to fall. He tried to keep from falling by jumping down approximately three feet and out about four or five feet. He landed awkwardly with his weight more to the right than left, injuring his right hip, right leg and lower back. Plaintiff had the immediate onset of sharp right hip pain, as well as lower back pain that was not as intense as the right hip pain.
14. After his injury by accident of May 31, 2006, plaintiff developed difficulty performing the physical demands of his job as a forklift service mechanic. He also began to experience difficulty walking as a consequence of his injury.
15. Plaintiff sought treatment with his family physician, Dr. Schaeffer, on June 19, 2006. Plaintiff's primary complaint was right hip pain. Dr. Schaeffer did not record anything about back pain that day. At his deposition, Dr. Schaeffer indicated that did not mean plaintiff's back pain was not discussed, but rather it was not the focus of the appointment. Dr. Schaeffer testified that often when a patient has a lot of pain in one area of the body, there may also be pain in other parts of the body that are not recorded. Dr. Schaeffer prescribed an injection for acute *Page 7 
pain and ordered an x-ray of the right hip, which revealed a fracture. Dr. Schaeffer then ordered an MRI of the right hip. The MRI of plaintiff's right hip on June 30, 2006, revealed avascular necrosis of the right femoral head with a non-displaced cortical fracture. Dr. Schaeffer referred plaintiff for an orthopedic consultation for his hip.
16. Dr. Schaeffer testified that if plaintiff's fall involved sufficient trauma to fracture the femoral head of plaintiff's hip, there could also have been sufficient trauma to aggravate the pre-existing condition in plaintiff's lower back. It was Dr. Schaeffer's medical opinion that mechanical changes in plaintiff's gait following hip replacement surgery certainly could have significantly contributed to the aggravation of plaintiff's pre-existing lower back condition.
17. Dr. Schaeffer reviewed the August 9, 2007 MRI report of plaintiff's lumbar spine and compared it to the report of the October 21, 2004 MRI. Dr. Schaeffer noted that the August 9, 2007 MRI revealed findings that were different from plaintiff's condition before the fall. Specifically, Dr. Schaeffer stated that there were findings of spinal stenosis and nerve compression on the August 9, 2007 MRI that were not present in the 2004 report. Dr. Schaeffer believed that plaintiff's lower back condition had changed since he treated it prior to the fall.
18. Dr. Schaeffer testified that on January 20, 2006, the last time he treated plaintiff before his injury of May 31, 2006, plaintiff had no compression of the nerve root at the L2 level of his lumbar spine or biforaminal stenosis at the L4-L5 and L5-S1 levels of his lumbar spine.
19. On August 1, 2006, plaintiff was evaluated by Dr. W. Bryan Jennings. The intake form completed by plaintiff for Dr. Jennings reported the sudden onset of pain after plaintiff's injury at work on May 31, 2006. Plaintiff's chief complaint was right hip pain. Dr. Jennings reviewed x-ray studies which revealed avascular necrosis of the right hip. *Page 8 
20. Dr. Jennings testified that if there was there was sufficient trauma to plaintiff's right hip to cause a collapse of the femoral head, then in his opinion that same trauma could also "certainly" cause or aggravate plaintiff's lower back condition. Dr. Jennings also stated that if plaintiff sustained an injury to the right hip which progressed to the point that there was a collapse of the femoral head, that injury was "absolutely" likely to cause mechanical gait changes. Dr. Jennings stated, "If your gait is thrown off through your hip, it could certainly cause problems in your back if you had a pre-existing condition."
21. On August 1, 2006, Dr. Jennings prescribed a cane for plaintiff to take pressure off the right hip and to attempt to alleviate the pain symptoms and help plaintiff's ambulation.
22. In discussing hip joint replacement surgery, Dr. Jennings stated that typically this type of surgery has a high degree of success. It would be unusual for a patient to have persistent leg pain following hip joint replacement surgery if the hip was the only source of pain. Dr. Jennings also believed that following hip joint replacement surgery, rehabilitation was essential to the recovery process. However, Dr. Jennings stated that the activities typically performed in rehabilitation following hip joint replacement surgery could be a potential problem for a person with a pre-existing back problem.
23. On August 23, 2006, plaintiff was referred by defendant-carrier to Dr. Peter Dalldorf for further evaluation and treatment. Dr. Dalldorf recorded the history of onset of plaintiff's symptoms as "on May 31, 2006, he was working on a piece of equipment when he slipped and landed on his right leg with his weight on his right side. He felt a sharp pain which persisted to the point that he began having constant, extremely severe pain, difficulty walking, climbing, squatting and difficulty sleeping." Dr. Dalldorf also noted a history of lower back problems going back to 1994 that required medical treatment. *Page 9 
24. On physical examination, Dr. Dalldorf found that plaintiff had extreme pain on rotation of his right hip and his range of motion of the right hip was very limited. He had good lumbosacral motion. Dr. Dalldorf made no notation of complaints of back pain because he concentrated on the most painful area, plaintiff's right hip. Dr. Dalldorf reviewed the previous x-rays of plaintiff's right hip, which showed an incongruity inside plaintiff's hip joint. It was Dr. Dalldorf's opinion that the hip condition was the result of trauma from plaintiff's fall at work on May 31, 2006.
25. According to Dr. Dalldorf, as a result of the injury of May 31, 2006, plaintiff had a collapse of his femoral head and developed a real mechanical problem inside the hip joint. Dr. Dalldorf recommended a total hip joint replacement to treat plaintiff's injury.
26. Dr. Dalldorf testified that plaintiff was unable to work in any capacity. Plaintiff could barely walk, could not really sit, and was in terrible pain. Dr. Dalldorf wrote plaintiff out of work on August 23, 2006.
27. At his deposition, Dr. Dalldorf testified and the Full Commission finds that the trauma plaintiff sustained when he slipped and jumped from the forklift on May 31, 2006, was sufficient to aggravate a pre-existing condition in plaintiff's lower back.
28. Before plaintiff's hip replacement surgery, Dr. Dalldorf's prognosis for plaintiff after surgery was that plaintiff would eventually be able to return to his previous occupation. Dr. Dalldorf explained that he felt there was a 95% percent chance of giving plaintiff a painless hip after surgery.
29. On September 21, 2006, Dr. Dalldorf performed plaintiff's right hip replacement surgery. He found that plaintiff had a complete collapse of the femoral head consistent with the *Page 10 
x-ray study. Dr. Dalldorf felt that the finding of the collapsed area of the femoral head was consistent with trauma from plaintiff's fall at work on May 31, 2006.
30. After surgery, Dr. Dalldorf explained that it was necessary for plaintiff to "relearn how to walk." Plaintiff exhibited a waddling gait for several months after his surgery. Dr. Dalldorf noted that plaintiff had trouble getting rid of a limp and putting appropriate pressure on his leg. The physical therapist observed in an assessment on September 26, 2006, that plaintiff exhibited significant weakness in his quads.
31. Dr. Dalldorf explained that the mechanical changes in gait following a hip injury or after hip replacement surgery can cause aggravation of a pre-existing degenerative condition in the lower back. In plaintiff's case, the foramen where the nerves exited were small because of the degenerative condition of plaintiff's back. Plaintiff's walking in an altered fashion after his injury put more stress on one side of the spine than the other, which can lead to further compression of the nerves as they exit the foramen.
32. Beginning December 11, 2006, plaintiff participated in a total of four work conditioning sessions that were then discontinued due to an increase in plaintiff's back pain.
33. Dr. Dalldorf reviewed a copy of a job site analysis in January 2007, which indicated that plaintiff's pre-injury job as a forklift service mechanic was in the very heavy demand category. Dr. Dalldorf determined that type of work was not appropriate for a person with a hip replacement. On January 10, 2007, Dr. Dalldorf assigned plaintiff permanent work restrictions of lifting no more than 50 pounds, no squatting, climbing, jumping or crawling.
34. Plaintiff began participating in vocational rehabilitation and job search as directed by defendant-carrier. As of the date of the Deputy Commissioner's hearing, plaintiff had submitted over 100 job applications, but had not received any job offers. Plaintiff diligently *Page 11 
searched for other employment within his permanent restrictions, but has been unsuccessful in his efforts to obtain other work. No evidence was introduced to suggest that other employment exists for plaintiff that will restore his pre-injury wage earning capacity.
35. Plaintiff returned to Dr. Dalldorf on February 7, 2007, and reported increased lower back pain. Dr. Dalldorf diagnosed "compensatory pain." Dr. Dalldorf explained that because of the hip replacement, plaintiff was unable to put all of his weight on that side, so that he compensated by placing greater weight on the opposite side. Plaintiff was unable to walk in a normal fashion, and as a consequence, put increased stress on his lower back and opposite hip.
36. Plaintiff continued to develop increasing back pain. Dr. Dalldorf reviewed plaintiff's 1999 and 2004 MRI studies. He testified that neither of those previous scans revealed stenosis. Following his examination of plaintiff on March 7, 2007, Dr. Dalldorf felt that plaintiff had passed the point of adjusting to his hip replacement and that his lower back was a significant cause of his ongoing pain. Dr. Dalldorf testified that plaintiff aggravated his lower back as a result of the fall itself and as a result of his altered gait. It is Dr. Dalldorf's opinion that plaintiff had lower back pain as a result of the fall that was masked by the fact that he had extremely severe hip pain.
37. As a result of plaintiff's compensable injury, Dr. Dalldorf recommended x-rays, an MRI of plaintiff's back, and selective injections to attempt to provide relief.
38. When defendant-carrier denied authorization for treatment of plaintiff's back as recommended by Dr. Dalldorf, plaintiff sought approval of such treatment from the Industrial Commission within a reasonable time period as required by N.C. Gen. Stat. § 97-25.
39. An MRI of plaintiff's spine was obtained on August 9, 2007. The MRI revealed a lateral disc protrusion at L2-L3 abutting the left L2 nerve root, central disc protrusions at L4-L5 *Page 12 
and L5-S1, and bilateral stenosis at L3-L4, L4-L5 and L5-S1. Dr. Dalldorf stated that the findings on the MRI were consistent with and explained plaintiff's complaints of back and leg pain. The findings on the August 9, 2007 MRI of plaintiff's back are significantly different from the pre-injury scans.
40. Dr. Dalldorf testified that plaintiff had underlying degenerative changes in his back, but the problems that are causing plaintiff's symptoms at this point are related to his fall at work. It is Dr. Dalldorf's medical opinion and the Full Commission finds that the fall plaintiff sustained at work exacerbated his underlying spine condition and caused the compression of the nerves that plaintiff is currently experiencing.
41. Dr. Dalldorf testified that plaintiff's back symptoms, which include numbness into his leg and pain in his back, make it difficult for plaintiff to work, even with permanent restrictions. According to Dr. Dalldorf, plaintiff's symptoms will not get better without further treatment. Dr. Dalldorf recommended further necessary treatment for plaintiff's back injury as a result of his fall at work, including selective injections.
42. Neither Dr. Schaeffer nor Dr. Jennings was involved in plaintiff's care when he began expressing complaints of increasing back pain in February 2007. To the extent that they did evaluate plaintiff's injury, both Dr. Schaeffer and Dr. Jennings agree that the trauma from plaintiff's fall, which caused the fracture of his hip, was sufficient to aggravate the pre-existing condition in plaintiff's spine. Both Dr. Schaeffer and Dr. Jennings agree that mechanical changes in plaintiff's gait following hip replacement surgery "certainly" could have aggravated the underlying degenerative condition in plaintiff's spine. The testimony of Dr. Schaeffer and Dr. Jennings supports the testimony and expert medical opinions of Dr. Dalldorf. *Page 13 
43. Plaintiff significantly aggravated the underlying degenerative condition in his lower back as a result of the trauma from his fall at work and as a consequence of the mechanical changes in his gait after his hip replacement surgery. This aggravation of his underlying degenerative back condition significantly contributed to the nerve compression that is a cause of plaintiff's pain and his need for medical treatment of his back as recommended by Dr. Dalldorf.
44. Plaintiff is not at maximum medical improvement. Plaintiff reasonably and timely sought Commission approval of necessary medical treatment for his back symptoms in his Form 33 that was filed with the Commission.
45. Plaintiff remains totally disabled from any employment. Plaintiff has diligently and reasonably sought other employment but has been unsuccessful in his search for other work. It would be futile for plaintiff to continue to search for other employment until after he has completed necessary treatment for his back injury.
46. Defendants have not prosecuted this action without reasonable grounds.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On May 31, 2006, plaintiff sustained an admittedly compensable injury by accident arising out of and in the course of his employment with defendant-employer. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff's fall at work on May 31, 2006, and the consequences thereof, including the need for hip replacement surgery on September 21, 2006, materially augmented, significantly aggravated or otherwise combined with plaintiff's pre-existing back condition to produce his *Page 14 
current back condition. Wilder v. Barbour Boat Works,84 N.C. App. 689, 352 S.E.2d 690 (1987). "When a pre-existing, nondisabling, non-job-related condition is aggravated or accelerated by an accidental injury arising out of and in the course of employment or by an occupational disease so that disability results, then the employer must compensate the employee for the entire resulting disability even though it would not have disabled a normal person to that extent." Goforth v. K-Mart Corp.,167 N.C. App. 618, 622, 505 S.E.2d 709, 712 (2004)(citing,Morrison v. Burlington Industries,304 N.C. 1, 18, 282 S.E.2d 458, 470 (1981)).
3. Defendants admitted the compensability of plaintiff's injury by accident on May 31, 2006 by filing a Form 60. However, the Form 60 does not create a presumption of continuing disability and therefore the burden of proving disability remains with plaintiff.Sims v. Charmes/Arby's Roast Beef,142 N.C. App. 154, 542 S.E.2d 277, disc. review denied,353 N.C. 729, 550 S.E.2d 782 (2001).
4. In order to meet the burden of proving disability, plaintiff must prove that he was incapable of earning pre-injury wages in either the same or in any other employment and that the incapacity to earn pre-injury wages was caused by plaintiff's injury.Hilliard v. Apex Cabinet Co.,305 N.C. 593, 290 S.E.2d 682 (1982). An employee may meet the initial burden of production by producing one of the following: (1) medical evidence that he is physically or mentally, as a result of the work-related injury, incapable of work in any employment; (2) evidence that he is capable of some work, but that he has, after a reasonable effort, been unsuccessful in his efforts to obtain employment; (3) evidence that he is capable of some work, but that it would be futile because of preexisting conditions, such as age, inexperience, or lack of education, to seek employment; or (4) evidence that he has obtained other employment at wages less than his pre-injury wages. Demery v.Perdue Farms, Inc., 143 N.C. App. 259, 545 S.E.2d 485 (2001); *Page 15 Russell v. Lowes Product Distribution,108 N.C. App. 762, 425 S.E.2d 454 (1993) (citations omitted). When a plaintiff meets his burden of showing disability, the burden then shifts to defendants to produce evidence that suitable jobs are available for the employee and that the employee is capable of obtaining a suitable job, taking into account both physical and vocational limitations. Demery v. Perdue Farms., Inc., supra.
5. In the instant case, plaintiff met his initial burden to show that he is disabled by the production of medical evidence that he is physically, as a consequence of the work-related injury, incapable of work in any employment, and the production of evidence that he has, after a reasonable effort on his part, been unsuccessful in his diligent efforts to obtain other employment. Additionally, it would be futile for plaintiff to continue to search for other employment both because of his age, limited education, and due to the physical symptoms from his back injury and the limitations from his hip replacement, until after he has completed necessary treatment for his back injury. Russell v. Lowes Product Distribution,supra. Defendants have not shown that suitable jobs are available for plaintiff and that plaintiff is capable of obtaining a suitable job, taking into account plaintiff's physical, mental and vocational limitations. Demery v. Perdue Farms, Inc., supra.
7. As a result of his compensable injury, plaintiff became temporarily totally disabled on August 23, 2006, and has remained temporarily totally disabled through the present and is entitled to payment by defendants of ongoing weekly temporary total disability compensation at the rate of $644.63, until further Order of the Commission. N.C. Gen. Stat. § 97-29.
8. Plaintiff is entitled to have defendants pay for all necessary medical treatment incurred or to be incurred by plaintiff as a result of his admittedly compensable injury by *Page 16 
accident of May 31, 2006, and as a result of his back condition which was significantly aggravated as a direct and natural consequence of the injury by accident. Medical treatment shall specifically include necessary treatment of plaintiff's back as recommended by Dr. Dalldorf, including the MRI scan of August 9, 2007. N.C. Gen. Stat. §§ 97-2(19) and 97-25.
9. Defendants did not defend this action without reasonable grounds and, therefore, plaintiff is not entitled to attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1. Sparks v. Mountain BreezeRestaurant, 55 N.C. App. 663, 286 S.E.2d 575 (1982).
 ***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to the attorney's fee approved below, defendants shall continue to pay to plaintiff temporary total disability compensation at the rate of $644.63 per week and continuing until further Order of the Industrial Commission.
2. Defendants shall pay all medical compensation incurred or to be incurred by plaintiff as a result of his compensable injury by accident, including treatment for plaintiff's back condition, as recommended by Dr. Dalldorf.
3. An attorney's fee of 25% of the benefits awarded to plaintiff in paragraph 1 of this Award is approved for plaintiff's counsel as a reasonable attorney's fee. Said fee shall be deducted from the award to plaintiff and paid directly to plaintiff's counsel.
4. Defendants shall pay the costs.
This 3rd day of March, 2009. *Page 17 
 S/___________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/___________________ PAMELA T. YOUNG CHAIR
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 *Page 1